## CRENSHAW, Appellant, v. LOOKER.

### Division One, December 22, 1904.

1. **WARRANTY: Breach: Failure of Consideration.** Where the cross-bill is founded on an alleged warranty in the purchase of a threshing machine, to-wit, that it was sufficient to thresh wheat, etc., that defense cannot be sustained by a showing that there was a total failure of consideration for the notes given in purchase of the machine. Proof of failure of consideration, standing alone, would, if properly pleaded, be a good defense in a suit on the note by the payee against the maker, but will not support a case bottomed on a warranty and a breach thereof.

2. ——: ——: **Purpose for Which Purchased.** Though a machine may be worthless for the purpose for which purchased, yet if it has a value for any purpose the purchaser cannot retain it and refuse to pay the purchase price on the theory of a total failure of consideration.

3. ——: ——: ——: **Return and Tender.** After using a threshing machine three weeks the setting of it on the roadside and requesting a neighbor to tell the vendor, if he should happen to see him, that it was there for him, is neither tendering nor returning it to the vendor.

4. ——: ——: **Conditional Warranty.** Defendant purchased a threshing machine with the sole purpose of using it in threshing and separating wheat, oats, etc., and plaintiff warranted it capable of doing that work satisfactorily if properly operated, and defendant's evidence shows that after three weeks' trial it was unfit for use as a thresher, and until it was repaired was of no use for any purpose, but it does not show that it had ever at any time during the three weeks been properly operated, but on the contrary it shows that at first it worked well and that it broke down because of careless and unskillful operation. *Held,* that there was no breach of the warranty.

5. **PRACTICE: Law Suit: Suspended by Equity.** When the sole ground of equity jurisdiction is that a remedy, merely ancillary to the legal remedy, may be afforded, for example, to hold matters *in statu quo* until the law suit can be ended, a chancellor may with propriety give the aid of his court to that extent and leave the parties otherwise free to pursue their remedies at law.

Appeal from Lincoln Circuit Court.—*Hon. E. M. Hughes,* Judge.

REVERSED AND REMANDED (*with directions*).

*William A. Dudley* and *Martin & Woolfolk* for appellant.

(1)   There is no implied warranty (except as to title) of a machine sold by one dealer or manufacturer. Benjamin on Sales (Bennett's Ed.), sec. 657; Tiedeman on Sales, sec. 190; Anthony v. Potts, 63 Mo. App. 517.   (2)   If the property was of any value for any purpose whatever it must have been returned to defeat plaintiff's cause of action, and such return must be prompt.   Brown v. Weldon, 27 Mo. App. 251, 99 Mo. 564; Tower v. Pauly, 51 Mo. App. 75; Mfg. Co. v. Magee, 42 Mo. App. 314; Cahn v. Reid, 18 Mo. App. 115; Kirk v. Seeley, 63 Mo. App. 262; Rubber Co. v. Rubber Co., 74 Mo. App. 266.   (3)   There is no implied warranty in those cases where the buyer selects the article or has opportunity for inspection, or where old or second-hand machinery is sold.   Bragg v. Morrell (Vt.), 34 Am. St. 102; 5 Wait, Actions and Def., p. 563; Norris v. Rimstedler, 90 Mo. App. 626.   (4)   The burden was on defendant to show conclusively that all the property was worthless, and not on plaintiff to show the contrary.   Branson v. Turner, 77 Mo. 495; Roth v. Wire Co., 94 Mo. App. 270; Thumnel v. Dukes, 82 Mo. App. 53; McCormick v. Brady, 67 Mo. App. 292.

*Norton, Avery & Young* for respondent.

(1)   We care nothing about the position taken by appellant's counsel as to implied warranty, and as to whether it applies to the second-hand machine, or to cases where an express warranty is pleaded, as in this case.   Here the plaintiff pleads an express warranty and then pleads that there was a total failure or breach of the warranty; offers proof to the court on this issue, and we think sufficient proof for the court to base a finding on, that there was a warranty and a

breach of that warranty. Then, if this be true, even though the court may have used the terms "warranty" and "failure of consideration" interchangeably, as they are capable of being used, and are often used both by the bar and the judiciary, still the court was justified in the finding. The evidence abundantly shows the warranty, the breach of the warranty, the worthlessness of the machinery only for old iron, the failure of the plaintiff to furnish tools or belts, and the earnest endeavor of the defendant to use the machine as he contemplated, and if possible to repair and use and pay for the same, and his utter failure to do so. And all these facts the court includes in this finding. Yet the plaintiff seeks to reverse this finding because he says that the evidence shows that the machinery was of some value, that is, at least the value of old iron. Our courts have had this come before them a number of times, and have universally decided in direct opposition to the contention of appellant's attorney. Brown v. Weldon, 99 Mo. 564; s. c., 27 Mo. App. 251; Comings v. Leody, 114 Mo. 454; Arnold v. Wilt, 86 Ind. 367. (2) Counsel for appellant contend that the answer does not set up the defense of failure of consideration, and therefore the court was not justified in finding a failure of consideration. We think the counsel has misconstrued the terms of defendant's answer. He pleads that the notes were given for the purchase price of the machine, belts, tools, etc., which the plaintiff was to furnish him, and he pleads that the machinery, tools, belts, etc., furnished him by the plaintiff under this contract, and as a consideration for these notes, were entirely worthless. This certainly would amount to the pleading of a failure of consideration. Then, again, there is a general denial in the answer, and under the repeated decisions of our Supreme Court the issue of failure of consideration is tendered by a general denial, and this is so decided in the case of Brown v. Weldon, supra.

VALLIANT, J.—Plaintiff sued in ejectment for a lot in the town of Elsberry. The lot had belonged to the defendant, who executed a deed of trust conveying it to a trustee to secure two notes for $250 each, payable to the plaintiff; when the notes became due, they were not paid, and the trustee sold the property under the terms of the deed of trust; the plaintiff became the purchaser at the trustee's sale for $225, and received the trustee's deed therefor. Those facts, together with the fact that the rental value of the property was $5 or $6 a month, were shown by the plaintiff's evidence at the trial.

In answer to the plaintiff's ejectment petition, the defendant filed a general denial, and an affirmative pleading in the nature of a bill in equity to redeem, which for convenient reference and for want of a more appropriate name, we will call a cross-bill, and which in substance was as follows:

After admitting the execution of the notes and the deed of trust, the sale thereunder and the purchase of the lot by the plaintiff, it is averred that the defendant and one Smith purchased of plaintiff a grain threshing outfit, in payment of which the notes mentioned were given, together with a chattel mortgage on the machine purchased and the deed of trust on the lot in question to secure the notes. That the only purpose defendant and Smith had in making the purchase was to use the machine in threshing and separating wheat, oats, etc.; that the plaintiff knew that fact, and warranted it capable of doing that work satisfactorily. if properly operated, requiring only slight repairs in the woodwork at the top of the separator, which repairs the defendant undertook to make and afterwards did make. That the plaintiff further represented that in the previous year he had threshed over 20,000 bushels of wheat with the machine, and if properly operated it was capable of threshing, cleaning and separating

1,200 or 1,500 bushels of wheat a day; that it had not been used exceeding five or six years; that plaintiff agreed to supply good belts, pipes, wrenches, oil cans and all other necessary tools before the threshing season of that year, and when defendant and Smith were ready to start the machine the plaintiff would, upon being notified, go with them and start it to work in good order.

That it was upon that warranty the purchase was made and the notes and deed of trust executed.

But that the machine "was wholly worthless for the purpose for which it was bought by defendant, and was wholly unfit and incapable of doing said work as a threshing machine;" that plaintiff, although notified, refused to assist in starting the machine and refused to furnish the belts, pipes, wrenches, oil cans, etc., necessary to operate it; that defendant employed a skillful man to operate it, but he could not do so, and employed a machinist to repair it, but it was so worthless it was beyond repair; that after giving it a fair trial and finding it totally unfit for use, defendant notified the plaintiff thereof and solicited him to come and repair it but "he refused to take any action or steps in the matter;" that after ineffectual efforts to operate it, defendant again "notified the plaintiff of these conditions and offered to return said outfit, and that plaintiff refused to permit him to do so and refused to receive said machine, and thereupon defendant abandoned the same and so notified plaintiff and has not had possession thereof since." The prayer is that the court hear evidence and if it should find that the facts stated by defendant are true that the plaintiff be required to bring the notes and deed of trust into court to be cancelled and satisfied on the record and the title to the lot be reinvested in the defendant. But that if the court should find that defendant purchased the machine under the warranty mentioned and that whilst

it was not capable of doing the work for which it was bought, yet it had value for other purposes, and that defendant did not offer to return it to the plaintiff, then that an account be taken charging defendant with the value that it may be found the machine possessed, within the contract price, and giving him credit for the outlays he was put to in the effort to make it work, and if a balance should be found in favor of plaintiff that defendant be allowed a reasonable time in which to pay the amount and redeem the land. The plaintiff's reply put the defendant's equity case at issue.

On the trial of the case made in the cross-bill the evidence for the defendant was to the following effect:

Smith testified that he and defendant, hearing that plaintiff had a second-hand threshing outfit for sale, and they intending to go into the business of threshing grain for farmers, went to see him about it. Plaintiff took them to a shed where the machine was and showed it to them. They noticed that it looked badly on the outside, but he said that that was owing to the fact that it had stood out one winter in the weather, but that it was all right inside. He said it had threshed 20,000 bushels of wheat the year previous, and he would guarantee it to do it again; that it would thresh as good as anybody's machine. He left them at the shed and went off to milk his cows, they remained there twenty minutes, may be an hour, but made no very close examination. In their talk with the plaintiff at the shed they told him that they would go and look at the engine and if after looking at it they concluded to make the purchase they would drop him a card when they went back to Elsberry and so notify him. The engine to run the machine was at that time running a sawmill at Whiteside's place, and they went there to examine it, but when they got there the engine had steam on and they made very little examination of it. It was noon and the men were called off from work. They did not

see the plaintiff again that day, but went home to Elsberry where they lived and wrote him a card from there saying that they would purchase the outfit for the price asked, $500.   On receipt of the card plaintiff went to Elsberry and the trade was closed on the terms set out in the cross-bill.

When witness and defendant got the outfit they set it up at Whiteside's farm to thresh his wheat. When they were ready to start the machine they sent word to the plaintiff by a negro to come and start it, but he never came; whether or not the negro delivered the message witness did not know.  Witness and defendant then undertook to start it, witness to run the engine and defendant the separator, but the effort was very unsuccessful.  "We fooled around there I don't know how long, something like a week, threshing his crop," which was about 1,000 bushels.  Then they moved the machine over to Lucas's farm and undertook to thresh his wheat and spent a week or more in that effort, then moved over to Wigginton's place to thresh his wheat, but all the while the thing got worse until finally after using it for three or more weeks the separator went all to pieces, the whole outfit became entirely useless, and they hauled it out near the road and sent word to the plaintiff that they had abandoned it and he could come and get it.   This message was sent by Mr. Whiteside who was going on his own business where he was likely to see the plaintiff, and  was requested  if he should see him to give him this message.  Neither witness nor defendant took any further concern about it and did not know whether the message was ever delivered.

The business in which this witness was engaged at the time of the trial was shoveling coal at coal chutes, though he said he had had "right smart experience running engines and operating threshing outfits."

Witness and defendant began to operate the machine without overhauling it or making a close exam-

ination of it. They soon discovered that it was out. of fix and witness did what he could to fix it, but that was not much because he had no tools, not even a wrench that was fit to work with. The boiler leaked. Just when it began to leak the testimony of this witness does not very clearly show. He said he looked at the flue sheets before he started the fire and if they had been sprung to amount to anything he would have discovered it. The engine, used as a road locomotive, had drawn the machine along the road and up hill to Whiteside's place which required greater strength and higher steam than to operate the thresher. When witness examined the engine at the sawmill, he opened the fire box; the boiler was not leaking then. Before they got through their three weeks' working with it, the boiler leaked so badly it put the fires out. On one occasion when witness left the engine while they were at Wigginton's and went to Elsberry to get some tools to work with, some one drew the fire because the water had run low in the boiler; witness said that the boiler had leaked before that, that it had "leaked the first time we got on a strain—120 pounds of steam."

The witness was of the opinion that the engine was of no account for the purpose for which he and defendant bought it, but that "it could have been saved" by repairing. He was asked what it was worth as it was; he answered: "Well after repairing"—but was interrupted to say what it was worth as it was, and he said it was worth nothing except as for old iron. Witness said they knew it was an old machine when they bought it, knew that it had been used at least five or six years, that the outfit new would have cost. $1,500 or $1,600 dollars.

The plaintiff was not engaged in the business of selling such machines, but owning such a machine and threshing grain for the farmers. He promised witness and defendant that he would not go into that neigh-

borhood to compete with them in the business and in that respect he kept his promise.

The testimony of defendant himself as a witness in his own behalf was in the main to the same effect as Smith's testimony.   As to the examination made by them of the machine at the shed before purchasing, he said it was not thorough, "on account of dust and dirt over it and straw and chaff and stuff in it, which had not been cleaned out the fall before, I don't suppose.  Chaff and some straw and a dead hen in it. Smelling very bad, that's one reason we didn't go into the machine until we could get it into the open air." When they went to the sawmill to examine the engine, steam was up, but it was dinner time and he was not sure that actual sawing had commenced, but "may be they had run a line or two while we was there—don't recollect"—did not make a very careful examination "took Mr. Crenshaw's word for it and guarantees on it more than anything else."

After they set the machine up at Whiteside's they made a little run that evening and then sent word by the colored man to plaintiff to come and start it; whether or not the message was delivered they never knew; the messenger told witness either that he had seen the plaintiff or had sent him word by some one. Plaintiff did not come, and they concluded "it was useless to go fooling around to hunt him up," and therefore undertook themselves to put the machine to work—they did not overhaul it because they did not suppose it needed overhauling—witness was not an expert, but "can run a separator right smartly.  Knew something about an engine, how to turn on water and turn it off and when it won't pump I am done." They depended on the colored man to adjust the machine; this colored man was hired as a feeder to the thresher. "We undertook to operate it and that's what we agreed to do.  Put the belts on, we had no tools, some old worthless wrenches that you couldn't turn a tap with hardly,

there was not a pipe wrench there, an old piece of an oil can. After we started and began to examine the tools we found none. Didn't examine much until we started to thresh." As soon as they began to operate the machine, they discovered that a cog was broken, "when it would get to that cog it would stop and we had to get up there and start it. Discovered that the first revolution we made—that was what I was doing up there instead of looking at the oats riddle. If I had been down I would have got on to that oats riddle business." This reference was in explanation of the fact that they had been trying for an hour to thresh wheat with the machine before they discovered that there was an oats riddle in it. During the three weeks or more in which they were trying to operate the machine they hired, besides the colored man above mentioned, one Hubbard for three or four days and one Monroe for a day or two, but witness did not know that either had had any experience.

The following is the witness's general summing up of the operations: "We would run a few minutes and then a belt would tear up or something would go wrong, and we would stop and fool and finally the engine got to leaking and we couldn't hold steam. Then the separator was all wrecked up in every region. How it happened, we kept on repairing it up and repairing it up every day and trying to run it, and finally we seen we couldn't do anything with it, and finally it tore all to pieces, the vibrator fell down and we quit her after we went to Dan Lucas's." Witness referred to the time when Smith went to Elsberry and left steam up and the water "mighty scarce," he said "we had to shut her down on account of it and I told them to go and draw the fire out of the — thing if I may use such a word."

Ed Waddington, a witness for defendant, saw the machine when it was on his place and when it was on Lucas's place, did not see it at Whiteside's. It was

in bad fix when he saw it. "Sometimes the engine and sometimes the separator was out of fix—considered the whole thing worn out. Did not examine anything until it broke down, then saw that it was rotten, that is, the plank flooring at the bottom of the shakers, which broke down." That was the only examination he made.

Josiah Whiteside, a witness for defendant, testified that with great difficulty they threshed about 1,000 bushels of wheat for him; they were a whole week doing it. Looker and Smith were doing the work with two negroes to help them. Witness got Hubbard and Monroe to help. "Some of them I term were men of experience. . . . Don't know what was the matter—everything was the matter—first one thing then another—sometimes the engine was out of fix, and they got the engine to run a little and the separator was out of fix and then the straw stacker got out of fix." The engine apparently worked well at first, the flues did not leak when it was first brought to his place, but they got to leaking afterwards. "The first work I saw the engine do after they got hold of it was moving on the road—moving into my place with it. It operated first rate; it was pulling the machinery right along; it was out on the road, that is, moving from the upper end of my place down into the field, about half a mile. A good road all, except you had to go up a hill on one place, a pretty steep hill. Went right along up the hill. It appeared to be all right."

Jap Tucker, a witness for defendant, saw the machine after it was moved over to Lucas's; it was all in bad fix, worn out, engine was worth only the price of old iron.

David Hubbard for defendant testified that he had had considerable experience running engines and was called to go over to Whiteside's and doctor the machine, and he got out of a sick bed to go. He did not examine the engine closely, because the sun was hot and he was

weak. He gave his attention chiefly to the separator and attempted to adjust it, but the belts were old, worn and patched, and he could not make them tight enough to run the machine properly. On another day when the machine had been moved to another yard, he was passing by and stopped and opened the fire-box and looked in and discovered that the boiler was leaking both water and steam. That was while Smith had gone to Elsberry for some tools. The witness said he did not examine the engine but he could hear it pounding three hundred yards away as though the whole thing was going to jerk to pieces. "Pounding is caused by two or three different things, principal thing is it's not properly adjusted—lined up and adjusted. New engine with perfect parts might pound if not properly adjusted, and can hear it two or three hundred yards and it injures it to run in that condition too." In the condition in which the engine was at that time it was worth nothing except as old iron. It would cost $150 or $200 to put it in good fix, then "it would be worth eight or nine hundred dollars, may be a thousand." It was a ten-horse power engine.

The foregoing is the substance of the defendant's evidence in support of his cross-bill.

The evidence on the part of the plaintiff was to the effect that he sold the outfit to defendant and Smith as old second-hand machinery, after full opportunity afforded them to examine it; that he not only did not warrant it, but expressly refused to so do; he did tell them that the year previous it had threshed over 18,000 bushels of wheat, which was the fact; they bought the machine on their own judgment; it was in fact capable, with some repairs and proper management, of doing good work, as much as might be expected of a machine of its known age and use; plaintiff never received a message from defendant and Smith or either of them to come and start the engine—never heard anything about their operation until he met Mr. Whiteside after

the close of the season and he told him that they had
made a failure of it and had set the machine out on the
roadside and abandoned it.

We deem it unnecessary to set out the plaintiff's
evidence more fully because we think that the defend-
ant, on his own evidence, was not entitled to any equit-
able relief; we will only say of the plaintiff's evidence
that both in quality and quantity it was fully as per-
suasive as that of the defendant.

The court rendered a decree in favor of defendant
cancelling the notes and deed of trust and reinvesting
the title to the lot in defendant. This decree is based
on the following finding therein recited: "The court
further finds that said notes were given without con-
sideration, the said threshing outfit sold by plaintiff
to defendant being worthless and of no value, and
thereupon the notes hereinbefore described were with-
out consideration and void."

It is not even stated in the cross-bill that the ma-
chinery was of no value; failure of consideration, in
whole or in part, is not the theory on which defendant
builds his case. The cross-bill is founded on the al-
leged warranty and its breach; the warranty being that
the machinery was sufficient for the particular purpose
for which defendant and Smith bought it, that is, for
threshing wheat, etc., and the breach charged being
that it was worthless for that purpose.

According to the cross-bill there were two con-
tracts, viz., that of the sale and that of the warranty.
If we were dealing with these contracts in a suit at
law, that is, if the plaintiff had sued at law for a judg-
ment on his notes, the answer setting up the alleged
warranty and its breach would be no defense to the
plaintiff's suit, but it would be, if properly pleaded, a
counterclaim. In such case the plaintiff would be en-
titled to a judgment on the notes, and the defendant, if
his proof sustained him, would be entitled to recover
on his counterclaim, and in the end the smaller judg-

ment would in effect go to the reduction of the larger one. Failure. of consideration, in whole or in part, if so pleaded and proven, would be a defense, complete or *pro tanto*, to the action on the notes. But proof of failure of consideration, standing alone, would not support a case bottomed on a warranty and a breach thereof. But the learned chancellor was of a different opinion and said: "As to whether there was an express warranty or an implied warranty is of no importance when there is a total failure of consideration." In that view of the law, though the chancellor might have not believed that there was a warranty as alleged in the cross-bill, still the defendant was entitled to the relief prayed.

The law on that subject is thoroughly and ably discussed in Brown v. Weldon, 27 Mo. App. 251, wherein there are three opinions, one by each of the judges of that court, HALL, ELLISON and PHILLIPS, JJ., and the same case coming to this court, the different views of those judges were considered, and the correct rule of law deduced therefrom in an opinion by BRACE, J. [Brown v. Weldon, 99 Mo. 564.] We deem it sufficient to refer to that case for our opinion of the law of that subject.

The questions of whether there was a warranty and a breach thereof, and if so how much was the damage, are questions which ordinarily a party sought to be charged is entitled to have tried by a jury. And whether a court of equity, in a case like this, could do more than restrain the plaintiff from foreclosing his deed of trust until those questions could be settled in the regular way, is itself a question. There is no doubt about the general proposition that a court of equity having jurisdiction of a case for any cause may, to avoid circuity of action, proceed to try all the questions in it, whether legal or equitable. But the application of that rule is to some extent within the discretion of the chancellor. Where the sole ground of equity jurisdic-

Crenshaw v. Looker.

tion is that a remedy, merely ancillary to the legal remedy, may be afforded, for example, to hold matters *in statu quo* until the lawsuit can be ended, then a chancellor may with propriety give the aid of his court to that extent and leave the parties otherwise untrammeled in their lawsuit. So, if, when the plaintiff in this case advertised the property for sale under the deed of trust, the defendant had come with his bill in equity seeking to enjoin the sale on the grounds now stated in his cross-bill, the chancellor would have been justified in extending the relief of the injunction limited in time until a court of law could try the case and render its judgment. If, instead of moving earlier, he sees fit to wait, as he has done, until the deed of trust is foreclosed and he is sued in ejectment for possession of the land and then comes with his cross-bill, without offering any excuse for his delay, a question of laches arises.

There is no necessity for deciding those questions now, owing to the view we take of the evidence, but they are suggested to show that if defendant has any standing at all in a court of equity it is on at least debatable ground.

Let us come now to the facts of the case as shown by the defendant's pleading and proof. The cross-bill, which is skillfully drawn, does not say that the machinery was worthless when defendant and Smith bought it; it says that they bought it for a particular purpose; that plaintiff knew for what purpose they were buying it, and warranted it good for that purpose, but that it was entirely worthless for that purpose, and it is argued that, therefore, the defendant was absolved from all obligation to pay the notes given for the purchase price. But that is not the law. As was shown in the opinion of this court in Brown v. Weldon, above referred to, though the machine were worthless for that purpose, yet, if it had a value for any purpose, the defendant could not retain it and refuse to pay his notes on the theory of a total failure of consideration. And

we will say in this connection that after using the machine three weeks or more and then setting it on the roadside and requesting a neighbor if he should happen to see the plaintiff, to tell him that it was there for him, was not either tendering or returning it to the plaintiff.

But the defendant's proof does not sustain even the qualified statement of the cross-bill. It does show that at the end of three weeks, after the machinery had been subjected to the usage they gave it, it was unfit for use as a thresher, and until it should be repaired was of no use for any purpose and of no value except the price of old iron. The chancellor measured its value at that stage and founded his decree on that estimate.

Referring again to the allegations in the cross-bill, we note that it is not stated therein that the plaintiff warranted unconditionally that the machine would do the work intended, but stated a condition, which perhaps would have been implied any way, but which nevertheless was expressed, that the machine would do the work *"if properly operated."* It is just on that point that the defendant's evidence exposes the weakness of his case.

We are satisfied from the defendant's own evidence that this threshing outfit broke down from the abuse it received in careless or unskillful operation. At the time defendant and Smith took possession of the engine it was furnishing power to a sawmill, of what size is not stated, and, so far as the evidence shows, it was doing its work well. The first work it did for defendant and Smith was to furnish the power necessary to move itself and draw the rest of the machinery along the road and up a rather steep hill. It did that work well. That required more power than to run the thresher. Defendant himself said and one of his witnesses said that the engine worked well at first.

When they went to look at the separator at the shed, before purchasing, they were told that it had been

in use six or seven years and had set out in the weather one winter. They saw that it was weatherbeaten, full of chaff, straw and dirt, and the chickens had been making their nests in it. Yet when they got to Whiteside's place they set it up and started it going without overhauling it and without adjusting it. Defendant said he did not overhaul it because he trusted to the warranty, and as to adjusting it he trusted a negro, whom he had employed as a feeder to the thresher, to adjust it.

Both he and Smith testified that it was the agreement with plaintiff that when they got ready to start the machine they were to notify him and he was to come and start it going and was to furnish belts, wrenches, oil cans, etc. If defendant and Smith were competent to set the machine up and start it, there was no use in engaging the plaintiff to do that for them; if they were not competent, they were to blame for attempting to do it, even if plaintiff had failed to come after being notified. The evidence on the point of notification was that they told a negro to go and tell him, and they afterwards heard the negro say either that he had told him or that he had told some one else to tell him, they were not certain which it was.

As soon as they started the machine, on the first revolution, they discovered that a cog was broken. If the machine was warranted to be in good order and there was a broken cog, that was a breach of the warranty to that extent, and the measure of damages was what it would cost to repair the broken cog, and the delay of the work while the repair was being made. But they were not justified in driving the machine on with a broken cog. Nothing but ignorance can take such an act out of the category of carelessness. It was also an indication of ignorance or carelessness that they had been trying to thresh wheat for an hour before they discovered that there was an oats riddle in the machine. Defendant testified that he had seen a man thresh wheat with an oats riddle; that may be, but it is some

evidence of unskillfulness or else of carelessness to undertake to do so without knowing that the oats riddle is in the machine, if it is there.

They testified that the plaintiff had agreed to furnish good belts and tools at the starting, but failed to do so, and they had to go on with belts of insufficient strength and with not even a wrench that would turn a nut and not an oil can with which to apply oil to the machine. If the furnishing of those things was a part of the plaintiff's obligation, and if he failed to furnish them, then he was liable for that breach of his obligation, but the measure of the damages therefor is what it would have cost the defendant to buy the articles, and the delay of the work, but it did not justify the defendant and Smith in attempting to run the engine without even the means to apply oil to it or a wrench to tighten a bolt and charge the consequences to the plaintiff.

Hubbard was the only witness introduced by defendant who appeared to be a machinist. He said that the last time he saw the engine he was passing by and heard it pounding at a distance of three hundred yards. He stopped and looked at it. The water was low in the boiler and it was leaking water and steam; the plates were sprung, and Smith, the engineer, was gone to town to buy tools. He said that the principal cause of an engine pounding is that it is not adjusted, that a new engine would pound as badly if not properly adjusted. He also said that to run an engine in that way would injure it. He said that whilst the engine as it was when he saw it was of no use and no value except the price of old iron, yet it could have been repaired at a cost of $150 or $200, and then would have been worth $800 or $1,000.

The defendant's proof failed to sustain the case set out in his cross-bill; from his own showing it is reasonable to conclude that the breakdown of the machinery was the result of unskillfulness or carelessness in

operating after it came into the hands of defendant and his partner Smith.

The judgment is reversed, and the cause remanded to the circuit court with directions to enter a decree for plaintiff dismissing defendant's cross-bill and judgment for plaintiff, in his cause of action for possession of the lot in question, with nominal damages and nominal monthly rents. ·

All concur, except *Robinson, J.,* absent.